IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

DEDDRICK CAMPBELL,

      Plaintiff,

v.                                                                              No. 03-2789 B

CCL CUSTOM MANUFACTURING INC.,
STEVE SHUTLER, TED MELLINGER,
ROGER BOSS, and CATHY
REGENWETHER,

      Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Deddrick Campbell, brought this action against Defendants CCL Custom Manufacturing, Inc. ("CCL"), Steven Shutler, Ted Mellinger, Roger Boss and Cathy Regenwether[1], alleging discrimination on the basis of race and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981; and the Tennessee Human Rights Act ("THRA"), codified at Tennessee Code Annotated § 4-21-101, et. seq. Before the Court is the motion of the Defendants for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court GRANTS the Defendants' motion.

---

[1] The Defendants maintain that Campbell subsequently voluntarily dismissed his claims against Cathy Regenwether. (Brief Support Def.'s Mot. Summ. J. ("Def.'s Mot.") at 19 citing Dep. Janet Taylor ("Taylor Dep.") at 64.) Campbell does not dispute this assertion in his response. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") at 24.) On this basis, the Court concludes that all claims against Defendant Regenwether are DISMISSED.

STANDARD OF REVIEW

Rule 56(c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers
> to interrogatories, and admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving
> party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm

Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing

a motion for summary judgment, the evidence must be viewed in the light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).  When the motion is supported by documentary proof such as depositions and affidavits,

the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts

showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324.  It is not sufficient

"simply [to] show that there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co., 475 U.S. at 586.  These facts must be more than a scintilla of evidence and must

meet the standard of whether a reasonable juror could find by a preponderance of the evidence

that the nonmoving party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

252 (1986).  Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  In this circuit, "this

requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes

of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  Finally, the "judge may not

2

make credibility determinations or weigh the evidence." <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th

Cir. 1994).

FACTS

The following facts are undisputed unless noted.  CCL is a contract manufacturer of

personal care products.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") Ex. G at 4.)  The

company operates a plant in Memphis, TN which, during the time of Plaintiff's employ,

manufactured personal care products, such as deodorant and shampoo, and ink jet cartridges for

Hewlett Packard.  (<u>Id.</u>)  Campbell began with CCL as a group leader on the Hewlett Packard line

in May 1998.  (Dep. Deddrick Campbell ("Campbell Dep.") at 41.)  By July 1998, Campbell was

working in the compounding unit as an "A Compounder."   (<u>Id.</u> at 41-42.)   In this position,

Plaintiff was responsible for combining chemicals in large vats to create batches which were later

packaged for sale to the public.  (Compl. ¶ 10.) With the exception of one Asian employee, all

other Compounders at CCL during the relevant time period were, like Campbell, African-

American. (Aff. Deddrick Campbell ("Campbell Aff.") ¶ 10.) His immediate supervisor, Donald

Peterson, as well as approximately eighty-percent of employees at CCL are African-American.

(Aff. Donald Peterson ("Peterson Aff.") ¶¶ 2, 5; Pl.'s Resp. Ex. R.)

On or about September 16, 2002,[2] an incident occurred in the alcohol mixing room at the

plant.  (Campbell Dep. at 73-75.)  Specifically, while compounding employee Vince Anderson

---

[2] The date of the incident is disputed and unclear from the record submitted by the parties. Plaintiff maintains in his response that the incident occurred on September 16, 2002.  (Aff. Deddrick Campbell ("Campbell Aff.") ¶ 22.)  However, the Record of Grievance filed by Plaintiff with CCL regarding the event states that it occurred on September 20, 2002.  (Pl.'s Resp. Ex. D at 506.)  Further confusing the issue, Defendants maintain, based on the date specified on CCL's incident report form,  that it occurred on September 18, 2002.  (Def.'s Mot. Ex. 2.)

3

was moving a large tank used to transport chemicals around the plant, it collided with a valve on a vat used to make chemical formulas. (Id.) Upon collision, the valve was damaged and product was spilled onto the floor. (Id.) While it is undisputed that Campbell was not involved in the accident, the parties offer differing views regarding whether he actually witnessed the incident or passed through the room just after it occurred. (Id.; Brief Support Def.'s Mot. Summ. J. ("Def.'s Mot.") at 3.) Regardless, upon notice, Campbell located his supervisor, Peterson, and informed him of the incident. (Campbell Dep. at 75.)

Peterson then advised Defendant Regenwether, CCL's Health, Safety, Security & Training Manager, that both Campbell and Anderson were involved in the incident.[3] (Peterson Aff. ¶ 3.) CCL's drug testing policy provides that employers "will send employees for [a] substance abuse test if they are involved in on-the-job accidents where personal injury or damage to company property occurs."[4] (Def.'s Mot. Ex. 3.) Following Peterson's report of the incident, Regenwether required both Campbell and Anderson to submit to a drug test. Campbell objected to the testing based on his non-involvement in the accident. (Dep. Cathy Regenwether ("Regenwether Dep.") at 78-80.) However, Plaintiff maintains that he submitted to the test because he believed he would be fired if he refused. (Campbell Dep. at 149.) The result of Campbell's test was negative. (Compl. ¶ 16.)

_____

[3] In his response to Defendants' statement of undisputed material facts, Campbell disputes this fact. (Pl.'s Resp. Def.'s Statement Undisputed Mat. Facts ("Pl.'s Resp. Def.'s Facts") ¶ 8.)However, it appears that he disputes his involvement in the accident, not the fact that Peterson erroneously reported to Regewether that Plaintiff was involved.

[4] Campbell maintains that CCL's policy is not "cohesive" and argues that it provides no specific criteria to establish which events result in drug testing. (Pl.'s Resp. Def.'s Facts ¶ 9.) Thus, Campbell contends that African-American and Caucasian employees were inconsistently subject to testing. (Id.) Nonetheless, Plaintiff does not appear to dispute that the referenced policy was in existence.

4

On or about September 23, 2002, Plaintiff filed a grievance with CCL pursuant to the procedures in the Collective Bargaining Agreement ("CBA") in effect with the Teamsters.  (Pl.'s Resp. Ex. D at 506.)  In the grievance, Campbell stated his concern that he was "made to go and take a drug test and alcohol test for nothing."  (Id.)  In response, Defendant Melliger denied the grievance and defended the action by stating the company policy as well as Peterson's identification of Campbell's involvement in the accident.  (Id. at 507.)  Peterson subsequently apologized to Plaintiff for what he characterized as his misunderstanding regarding the employee's relationship to the incident.  (Def.'s Mot. Ex. 4; Peterson Aff. ¶ 4.)  No disciplinary action was taken against Campbell as a result of his erroneous inclusion in the incident.  (Campbell Dep. at 84.)  On or about October 21, 2002, Plaintiff filed a complaint with the Tennessee Human Rights Commission ("THRC") alleging discrimination on the basis of the drug testing incident.  (Pl.'s Resp. Ex. D at 475-85.)  In addition, he claimed that, as a result of his filing a grievance, CCL retaliated against him by cutting his overtime work and subjecting his department to additional duties and more write-ups.  (Id. at 478.)  Campbell maintains that he decided to file the  complaint after Dustin Shutler, a Caucasian employee in the mechanics department, was not required to submit to a drug test following a work-related accident.  (Campbell Dep. at 56-7.)  Campbell does not, however, allege that company property was damaged or that Shutler sought medical treatment as a result of the accident.  (Id.)

Pursuant to Article 4 of the CBA in effect between CCL and the Teamsters, the employer was required to initially offer non-scheduled weekend and holiday overtime work to the most senior qualified employee within a department and job classification.  (Def.'s Mot. Ex. 6 at ¶ 4.6.)

Similarly, any work remaining, after scheduled overtime or non-scheduled overtime exceeding two hours beyond a shift, must first be offered to the senior qualified employees in the department in the job classification on the shift where the overtime was available.  (Id.) Any grievances regarding CCL's compliance with these provisions of the CBA must first be presented to the employee's supervisor within four days of the event giving rise to the grievance, or when the employee should have reasonably become aware of the facts constituting the grievance.  (Id. at ¶ 12.2.) Within three days, the supervisor must respond to the employee's grievance.  (Id.)  If the matter is not satisfactorily resolved, Article 12 of the CBA provides additional procedures, including presentation to the department supervisor, presentation to the plant manager and arbitration, to resolve the employee's complaint.  (Id. at 12.2-12.4.)

As noted above, at all times relevant to the instant action, Plaintiff was employed with the Compounding Unit.  (Campbell Dep. at 41-42.)   At the time of his THRC claim, twelve employees, all African-American, worked in the Compounding Department on the first shift. (Def.'s Mot. Ex. 5 at 488.)  According to Campbell, he was the third first-shift "A" Compounder in seniority in his department.  (Campbell Aff. ¶ 25.)  The parties dispute whether overtime was administered to the employees within the Compounding unit in accordance with Article 4 of the CBA. (Def.'s Mot. at 4-5; Campbell Dep. at 101-02.)  However, it is undisputed that Unilever, a client of CCL, withdrew a portion of its business from the plant in the fourth quarter of 2002.[5]

---

[5]  The Court notes Plaintiff's discontent that "CCL stated that Unilever has pulled its production line from CCL's plaint as a reason for the overtime reduction, on the last day on the discovery in this litigation." (Pl.'s Resp. at 12.) However, this statement of concern does not negate the facts presented by the Defendant, in the form of deposition testimony, that the reduction in plant volume did in fact occur. Plaintiff further avers that "several employees remember that line being changed at another time."  (Id.) In support of this statement, Plaintiff cites the deposition testimony of Brearn Wright who stated that he

(Dep. Janet Taylor ("Taylor Dep.") at 121-23.)  As a result, the plant experienced an overall reduction in work volume.  (Id. at 121-22.)  Campbell maintains that he filed two grievances pursuant to Article 12 of the CBA regarding overtime scheduling.[6] (Pl.'s Resp. at 2.)

During the period between November 2002 and January 2003 , three incidents of graffiti occurred in the restroom used by the male compounders and mechanics.[7]  (Taylor Dep. at 110-11.)  None of the incidences of graffiti explicitly named Campbell.  (Campbell Dep. at 93.)  However, it is undisputed that the third instance during this period contained hostile racial statements and illustrations.  (Dep. Catherine Jean Regenwether ("Regenwether Dep.") at 130-35.)  In response to the graffiti, CCL photographed and compared it with handwriting samples of employees in company personnel files; repainted the bathroom black to hinder repeat incidents; re-positioned a surveillance camera to monitor the entrance and exit of the restroom; and posted a notice and a memorandum[8] on the employee bulletin board which outlined company

_____

was "pretty sure" that Unilever removed its business after Campbell left CCL's employ.  (Aff. Brearn Wright ("Wright Aff.") ¶ 15.) The Court finds that this vague statement is insufficient to rebut the deposition testimony and documentary evidence submitted by the Defendant.  (See Taylor Dep. at 121;Def.'s Mot. Ex. 5.)

[6]  The Court notes that neither party has submitted records of these alleged grievances.

[7] The parties dispute whether the graffiti problem "began" in November 2002 or whether it had in fact been a continual problem since January 2002.  (Def.'s Mot at 5; Pl.'s Resp. at 3.) However, Plaintiff does not cite any specific incidence of graffiti in addition to the three identified by the Defendant during the months following Campbell's filing of a complaint with the THRC.  Further, Plaintiff acknowledges that an earlier incidence of racial graffiti was directed at a specific employee.  (Campbell Dep. at 93.)

[8]  The notice read as follows:
CRIME STOPPERS: A reward will be given to anyone who is a witness to or has information leading to the positive identification of individuals who are tampering with company property, vandalizing company property, stealing company property/product or stealing company time.  If you have information, please see your Department Manager, Janet Taylor or Kathy Regewether.

(Def.'s Mot. Ex. 8.)  An additional Memorandum was posted by Janet Taylor on January 31, 2003

policy regarding such conduct and offered a reward for information concerning the offender. (Taylor Dep. at 105; Def.'s Mot. Ex. 8.)  It is undisputed that CCL did not identity the author of the graffiti as a result of the steps it took.  It is further uncontested that Campbell did not file a grievance with CCL management related to the graffiti or otherwise voice his concern that such statements were directed at, or intended to harass, him.[9]  (Taylor Dep. at 104-05.)

      CCL's Anti-Harrassment policy, as set forth in both the Hourly Employee's Handbook and the CBA, addresses both sexual and racial harassment.[10]  Specifically, the policy provides

stating:

> Over the last few months, employees have been writing on the bathroom wall in the upstairs men's restroom.  We have painted this area twice within the last couple of months for this very reason.  It's now become even more serious due to some of the disgusting and degrading comments written and pictures drawn.  **All employees should be aware that deliberate defacing, damaging or destroying company property is a zero tolerance offense.  The company will do everything within its power to identify those responsible for this cowardly, offensive and vile behavior.  Any employee found to be responsible for these acts will be immediately dismissed**.
> If you have information regarding, please see your manager, K. Regenwether, or myself.  A reward will be given for any information obtained leading to the positive identification of any employee(s) tampering, vandalizing or stealing company property or company time.

(Id.) (emphasis in original.)

---

[9]  Plaintiff states that this fact is disputed, but offers no statement or evidence from which the Court can make such a determination.  (Pl.'s Resp. Def.'s Facts ¶ 38.)  Rather, he states in response to Defendant's statement of fact that Campbell "never complained to the Human Resources Manager, Janet Taylor, that he was being harassed," that he filed three grievances including one related to the drug-testing incident and two related to overtime schedules.  (Id.)  However, because none of the proffered three grievances filed by Plaintiff concerned the racial graffiti, it appears to the Court that Plaintiff's lack of complaint to CCL management regarding the graffiti is not in dispute.

[10]The Court recognizes that Plaintiff disputes the existence of any specific company policy regarding racial harassment because the policy cited by CCL jointly addresses harassment based on both sex and race and further, because the policy, as it relates to race, is not discussed in the Supervisor and Manager Handbook nor, according to Campbell, enforced by CCL.  (Pl.'s Resp. Def.'s Facts ¶ 32.)  However, Plaintiff does not argue that the quoted policy language appears in the Hourly Employee's Handbook or the CBA.  (Id. ¶ 34.) (noting that the notice posted by CCL following the incidence of racial

that

> CCL Custom Manufacturing believes all employees should have a working environment free from harassment relating to their race, color, religion, sex, national origin, age, marital status and disability status.  Negative remarks about any of these personal characteristics will not be tolerated . . . All complaints of harassment will be promptly and thoroughly investigated . . . If after an investigation has been completed and it is determined that an employee has engaged in harassment, he/she will be subject to appropriate disciplinary action up to and including termination.

(Pl.'s Resp. Ex. G at 6.)  In contrast, CCL's Supervisor and Manager Handbook addresses only the issue of sexual harassment.  (Pl.'s Resp. Ex. F at 10.)

On February 17, 2003, Campbell accepted a position with the Carrier Corporation as a fork-lift driver. (Campbell Dep. at 14.)  Thereafter, he resigned from CCL on February 24, 2003. (Def.'s Mot. Ex. 10.)   As part of his resignation, Campbell executed a company-provided document stating that his departure was due to his acceptance of other employment and affirming that he had "no claims or grounds for any claims against [CCL] based on [his] time of employment with the company."  (Id.)

Campbell originally commenced this action on September 26, 2003 in the Circuit Court of Shelby County, Tennessee alleging racial discrimination and retaliation by Defendants CCL, Shutler, Mellinger, Boss, and Regenwether.  On October 23, 2003 the Defendants removed the action to this Court based on federal question jurisdiction under 28 U.S.C. § 1331.

<u>ANALYSIS</u>

<u>I. Claims against Defendant CCL</u>

Campbell maintains that Defendant CCL unlawfully discriminated against him by

---

graffiti "merely restated CCL's 'zero tolerance' policies which have been in the [CBA] for many years.")

9

maintaining a hostile work environment and retaliated against him for filing a discrimination charge in violation of Title VII, 42 U.S.C. § 1981, and THRA. All three statutes relied upon by Plaintiff protect claimants from discrimination in employment and are properly analyzed under the framework for Title VII discrimination claims. See Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004)(noting that actions brought under § 1981 are subject to the same analysis as those initiated under Title VII); Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 683-84 (Tenn. 1998) ("[a]lthough the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with federal law.  We, therefore, may look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination statute.").

### A. Hostile Work Environment

Campbell first alleges a "compound" hostile work environment claim against Defendant CCL.  See Disler v. Target Corp., No. 3:04-CV-191, 2005 WL 2127813, *16 (E.D. Tenn. Aug. 31, 2005) (citing Pennsylvania State Police v. Suders, 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004)). Specifically, he maintains that (1) CCL discriminated against him by subjecting him to a hostile work environment based on his race; and (2) this hostile work environment resulted in constructive discharge.

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 91 L.Ed.2d 49(1986))(internal quotations and citations

10

omitted).  In order to establish a prima facie case of hostile work environment based on race under Title VII, a plaintiff must show that:  (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) the defendant  knew or should have known about the harassment and failed to take action.  Moore v. KUKA Welding Systems & Robot Corp., 171 F.3d 1073, 1078 -1079 (6th Cir. 1999).  Further, a racially hostile work environment claim is "cognizable only if the purported harassment, viewed in conjunction with all the circumstances, occurred because of the employee's race."  Farmer v. Cleveland Public Power, 295 F.3d 593, 605 (6th Cir. 2002)(citations omitted), *abrogated on other grounds*, White v. Columbus Metropolitan Housing Authority, 429 F.3d 232, 238 (6th Cir. 2005).

The Supreme Court applies a totality of the circumstances approach to determine whether a hostile work environment claim is actionable considering: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting Harris, 510 U.S. at 23, 114 S.Ct. at 371.) (internal quotations omitted).  The "conduct must be extreme to amount to a change in the terms and conditions of employment."  Id. at 788.  In other words, the harassment must have "adversely affected the employee's ability to do his or her job." Moore, 171 F.3d at 1079. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 787-88(internal quotations and

11

citations omitted).

In order to survive the Defendants' motion for summary judgment, Campbell must sustain his burden of proof as to each of the five elements of his hostile work environment claim. He clearly satisfies the first element as he is African-American and thus, a member of a protected class.  In support of the remaining elements of his claim, Campbell cites several incidents of conduct by CCL, including (1) discriminatory application of CCL's drug-testing policy;(2) reduction of overtime; (3) rumors of his involvement in drugs and/or stealing; and (4) the January 2003 incidence of racial graffiti in the men's restroom.  Viewing the facts most favorably to the Plaintiff, the Court finds that Campbell has not established a prima facie claim of hostile work environment on the basis of these events.

Regarding the drug testing incident, CCL policy provided for the testing of individuals in two situations.  First, employees are screened when they "have caused or contributed to an on-the-job injury that resulted in a loss of work-time, which means any period of time during which an employee stops performing the normal duties of employment and [l]eaves [sic] the place of employment to seek care from a licensed medical provider." (Def.'s Mot. Ex. 3.)  Second, and somewhat redundantly, employees are tested "if they are involved in on-the-job accidents where personal injury or damage to company property occurs." (Id.)  Neither party now contends that Campbell was personally injured or involved in the September 2003 accident involving damage to a valve in the alcohol room and thus should have been referred, on the basis of CCL's policy, for a drug test.  (Def.'s Mot. at 3.)  In her deposition testimony, Regenwether states that her referral of Campbell for testing was because of Peterson's report, albeit erroneous, that Campbell

12

was involved in the accident. (Regenwether Dep. at 75-78.)  The parties do not dispute that prior

to submitting to the test, Plaintiff informed Regenwether that he was not involved.  (Regenwether

Dep. at 80–81.)  Regardless of whether Peterson was informed or realized his error prior to the

testing, Regenwether's decision, premised on the information presented to her by Peterson at the

time, was entirely consistent with company policy and unrelated to Plaintiff's race.  Further, there

is no indication in the record that Peterson's erroneous report to Regenwether was motivated by

racial animus.[11]  Rather, it appears that Peterson simply misunderstood the information Campbell

presented to him and failed to correct his error prior to administration of the drug test.  (Def.'s

Mot. Ex. 4.)  On these facts, Plaintiff has failed to establish that the decision to refer him for drug

testing was racially motivated.   Further, because CCL undertook an investigation of his

grievance[12] which resulted in an apology to Campbell, Plaintiff has not demonstrated that CCL

failed to take corrective actions as required by the fifth prong of the prima facie case.

The Court notes Plaintiff's contention that CCL's failure to require a Caucasian mechanic,

Dustin Shutler, to submit to a drug test following a work incident in which he suffered a cut on

his head as evidence that CCL's test policy was not evenly applied according to race.  (Pl.'s Resp.

at 2; Campbell Dep. at 57.)  The Court does not agree.  As a preliminary matter, Shutler was a

---

[11]  The Court notes Campbell's testimony that Peterson told him there was nothing he could do regarding the situation and advised him to "quit causing trouble around the company."  (Campbell Dep. at 85-86.)  However, there is nothing to suggest that these statements were motivated by Campbell's race or that they indicate any sort of racial bigotry on the part of Peterson, who was also African-American.

[12]  Plaintiff states in his response to the instant motion that his grievance regarding CCL's drug testing policy was "dismissed without investigation." (Pl.'s Resp. at 11.)  Because Campbell concedes in the same paragraph that the grievance meetings pursuant to the CBA process were held and does not dispute that an apology was issued by Peterson, the Court concludes that Campbell's argument is not about whether an investigation was conducted but merely disputes the adequacy of such investigation. (Id.; Pl.'s Resp. Def.'s Facts ¶ 10.)

mechanic under the supervision of Ted Shutler.  In contrast, Campbell was a compounder under a different supervisor.  Unlike the incident in the alcohol room with which Campbell was mistakenly identified, the accident concerning Shutler did not involve damage to company property.  (Campbell Dep. at 57 noting that Shutler's injury resulted from a pipe that "came loose.")  Further, despite Campbell's belief that Shutler was in need of medical attention, the facts reveal that Shutler did not seek such treatment. (Id.)  On these facts, in contrast to those surrounding the alcohol room accident as reported to Regenwether by Peterson, CCL's drug testing policy was inapplicable to Shutler.

Plaintiff next offers in support of his hostile work environment claim that, as a result of his filing of a grievance relating to the drug test incident, CCL retaliated against him by reducing his overtime. (Pl.'s Resp. at 11.)  Again, the Court finds that Campbell has failed to show that the reduction in overtime was based on his race.  It is undisputed that the Memphis plant experienced a decrease in volume of work in the fall of 2002 as a result of the loss of the business of Unilever. (Dep. Janet Taylor ("Taylor Dep.") at 121-23.)  It is further without argument that the CBA agreement in effect between the Teamsters and CCL governed the manner in which overtime work was distributed to employees. (Def.'s Mot. Ex. 6 at ¶ 4.6.)  Campbell maintains that the overtime was not offered in accordance with the terms of the CBA. (Pl.'s Resp. at 12.) He further avers that, during the time in which his overtime was reduced, CCL posted a job opening for a first-shift "A" Compounder, allegedly indicating that there was an unfilled need for work within his job classification. (Wright Dep. Ex. 3.)  In support of his contention that the policy was not enforced correctly, Campbell alleges that his overtime was less than "more junior "A"

14

Compounders and "consistently less" than Lead compounder Ray Rhodes. (Id.) However, as noted by Plaintiff, at the time of the reduction in his overtime, all other compounders, with the exception of one of Asian descent, were also African-American. (Campbell Aff. ¶ 10.)

While not overtly racial, such reductions, alleged by Campbell to have been in retaliation for his discrimination complaint, could contribute to a hostile work environment claim if he demonstrated "that the actions would not have occurred but for the fact that [he] was African-American." Jones v. Miller Pipeline Corp., No. 304CV174H, 2005 WL 2297521, *5 (W.D. Ky. Sept. 21, 2005) (citing Jackson v. Quanex Corp., 191 F.3d 647, 662 (6th Cir.1999)). However, Plaintiff has made no such showing. Rather, it appears to the Court that all CCL employees experienced an overall reduction in available overtime in the fall of 2002. Because the workers alleged to have benefitted at Campbell's expense from any inconsistencies[13] in the application of the CBA agreement are of his same race and because he has provided no other evidence that his race was a factor in the overtime he received, the Court cannot conclude that the distribution decisions would not have occurred but for his race. Id.; see also Dillon v. Frank, 952 F.2d 403, (6th Cir. 1992) (noting that Title VII provides a remedy only where harassment is directed at the plaintiff for a statutorily impermissible reason).

Campbell next cites several miscellaneous allegations including rumors within the company regarding his involvement in selling drugs, video surveillance, and an accusation that he stole a pair of shoes. (Pl.'s Resp. at 13.) However, he has failed to allege or submit proof that

---

[13] Without reaching the issue, the Court assumes *arguendo* that the policies were incorrectly implemented as Plaintiff contends. Because, even under this most favorable scenario Plaintiff's allegation does not establish a prima facie case of hostile work environment, the Court will not address whether the CBA was accurately implemented.

any of these events would not have occurred but for his race.  Accordingly, these incidents are not cognizable under Title VII.  Farmer, 295 F.3d at 604.

Finally, Campbell offers evidence of a single incidence of racial graffiti in the men's restroom used by both compounders and mechanics in January 2003 as the basis of his hostile work environment claim.[14]  (Pl.'s Resp. at 15-16.)  There is no doubt that the graffiti which appeared in January, as described by Campbell and not refuted by CCL, contained extremely hostile and offensive racial messages.  Specifically, Plaintiff describes the writings as containing the statements "kill all niggers" and "white power" along with a drawing of a person hanging by a noose from a tree.  (Id. at 16.)  He acknowledges that the graffiti did not contain any specific reference to him.  (Campbell Dep. at 93.)  Rather, because of his race and because "the [Equal Employment Opportunity Commission] was requesting additional information from CCL [regarding his discrimination charge] at the same time the graffiti went up," Campbell believes that it was directed at him.[15]  (Pl.'s Resp. at 16.)  Because of his belief that he was the target of the graffiti and the serious nature of the racial threat it posed, Campbell maintains that, upon seeing the language, he "feared for [his] life."  (Campbell Dep. at 138.)

While there is no explicit indication in the record that the writing was directed at

_____

[14] Campbell claims that graffiti was "commonplace" prior to the incident in January 2003.  (Pl.'s Resp. at 15.) However, because he does not cite evidence of any other incident of racial graffiti as contributing to the instant hostile work environment claim, only the January 2003 report will be considered here.

[15] The Court notes that the Tennessee Human Rights Commission requested information from CCL regarding Campbell's charge of discrimination on November 8, 2002.  (Pl.'s Resp. Ex. D.) CCL responded to the charge on December 18, 2002.  (Def's Mot. Ex. 5.)  Neither party has specified the date in January 2003 on which the racial graffiti appeared.

Campbell, "racial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to [him]." Jackson, 191 F.3d at 661. However, whether Campbell was the intended target of the graffiti is relevant to the Court's analysis of whether the harassment suffered was sufficiently severe and pervasive to be actionable under Title VII. Wilson v. Dana Corp., 210 F.Supp.2d 867, 878 (W.D. Ky. 2002). It is questionable whether one single incidence of racially hostile graffiti, not explicitly directed at the Plaintiff, is sufficiently severe or pervasive as to have altered the terms and conditions of Campbell's employment. See e.g. Jones, 2005 WL 2297521 at *5 ("One racist comment over the course of almost two years, which was not clearly directed at Plaintiff, does not constitute severe or pervasive harassment, even if he regarded it as abusive."). However, because the final prong of a prima facie case of hostile work environment, namely whether CCL "knew or should have known about the harassing conduct but failed to take any corrective or preventive actions," is not met in this case, the Court need not address whether one instance, albeit one extremely serious in nature, is sufficient in this Circuit to demonstrate a hostile work environment. Farmer, 295 F.3d at 604 (citation omitted).

The undisputed facts demonstrate that CCL, upon notice of the graffiti, immediately took steps to have it removed and prevent its reoccurrence. Specifically, CCL (1) painted the walls of the restroom black to discourage graffiti; (2) took pictures of the wording and compared it to handwriting in personnel files; (3) altered the direction of a security camera to face the restroom door; (4) posted a notice regarding the company's "zero-tolerance" policy as related to destruction of property and offering a reward for information regarding the offender; (5) posted

a "Memorandum" again reiterating company policy and describing the graffiti as "disgusting and degrading." (Taylor Dep. at 105; Def.'s Mot. Ex. 8.) Plaintiff's argues that CCL failed to undertake any investigation into the incident because the Defendant did not interview employees and/or determine who was responsible. (Pl.'s Resp. at 16.) While CCL did not ultimately identify the offenders, it clearly stated its condemnation of the activity and responded with corrective measures. See Davis v. Monsanto Chemical Co., 858 F.2d 345, 349 (6th Cir. 1988) (quoting DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir.1980) ("[A]n employer who has taken reasonable steps under the circumstances to correct and/or prevent racial harassment by its non-supervisory personnel has not violated Title VII."); see also Fouce v. Lowe's Home Improvement Center, Inc. No. 104CV416LJMWTL, 2005 WL 3532759, *12 (S.D.Ind. Dec. 22,2005) (finding three incidences of racial graffiti including statements such as "nigger go home" on company restroom walls insufficient to sustain a hostile work environment claim where, upon complaint by the plaintiff, the defendant immediately painted over the graffiti and stated that "if they found out who was responsible, the issue would be promptly addressed."); Wilson, 210 F.Supp.2d at 881(finding no prime facie case of hostile work environment where the plaintiff repeatedly saw explicitly racist graffiti on the bathroom walls but, after his complaints, the defendant removed the offensive graffiti within a week of its appearance).

Further, the record does not reflect that CCL failed to address any complaint by Plaintiff regarding the graffiti. Rather, Campbell concedes that he never personally complained to CCL management about the racist writings.[16] (Pl.'s Resp. at 21.) Campbell's argument seemingly

---

[16] The Court acknowledges Campbell's argument that CCL failed to respond to the graffiti because management never attempted to discuss or address his October 2002 discrimination charge.

adopts a futility logic.  That is, Campbell maintains that because CCL management did not

discuss his October 2002 discrimination charge regarding the drug test incident directly with him

and because the company did not have explicit procedures for management to follow in

addressing harassment claims, any complaint made by him would not have been addressed.  (Pl.'s

Resp. at 20-21.)  The Court finds this argument to be unpersuasive. The CCL Hourly Employee's

Handbook provided notice to employees regarding the company's anti-harassment policy.  (Pl.'s

Resp. Ex. G.)  It directed employees to inform his or her immediate supervisor or the Human

Resources Department regarding any harassment situations.  (Id.)  While Campbell maintains that

CCL's anti-harassment policy is "disjointed and unclear," he cannot establish that the Defendant

in any way condoned or tolerated the offensive graffiti or ignored any complaint he made in

response.  Rather, the record clearly reflects that, when notified about the graffiti, CCL took

prompt and reasonable measures to remedy the situation. See Davis, 858 F.2d at 349 -50 (6th Cir.

1988) (affirming summary judgment for employer where, in response to notice regarding racially

derogatory graffiti, the employer took "quick and appropriate measures to remedy the situation"

by painting over it the next day.)

    Finally, the Court is reminded that "the issue is not whether each incident of harassment

standing alone is sufficient to sustain the cause of action in a hostile environment case, but

whether - taken together- the reported incidents make out such a case." Jackson, 191 F.3d at 659

(quoting Williams v. General Motors Corp., 187 F.3d 553, 562 (6th Cir.1999)).  However, as

_____

(Pl.'s Resp. at 14-15.)  However, because that charge was filed three months prior to the graffiti incident
and dealt with discrimination, retaliation and harassment only on the basis of the drug test, the Court finds
that Plaintiff's contention is unrelated to the question of responding to the drug testing incident.

noted in the analysis above, Campbell has demonstrated only one incident of harassment, namely the racial graffiti, which may have occurred because of his race. Further, with regard to this single occurrence, Plaintiff has not shown that, in response to its appearance, CCL failed "to take any corrective or preventive actions as required to establish a prima facie case of hostile work environment. Farmer, 295 F.3d at 604 (citation omitted). While Campbell may have suffered unfavorable treatment or conflict during his employment, on the facts presented, he has not met the showing required by Title VII to establish a hostile work environment based upon race.

### B. Constructive Discharge

In order to prevail on his claim of a hostile-environment constructive discharge claim, Campbell "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police, 542 U.S. at 147, 124 S.Ct. at 2354. Because Plaintiff's claim for hostile work environment, on which his assertion of constructive discharge is based, fails, so too must his claim for constructive discharge. See Plautz v. Potter, No. 04-6105, 2005 WL 3479840, *7 (6th Cir. Dec. 21, 2005) (holding that where the complained of actions do not rise to the level of a hostile work environment, "they necessarily do not rise to the level of compelling a reasonable person to resign."); see also Disler, 2005 WL 2127813 at *20 (holding that it "naturally follows" that a plaintiff cannot prevail on a claim for constructive discharge when that allegation is based on a failed hostile work environment claim).

### C. Retaliation

Campbell also alleged that CCL unlawfully engaged in retaliation in response to his charge of discrimination based on the September 2002 drug testing incident. (Pl.'s Resp. at 18.)

In order to prevail on a claim of retaliation, a plaintiff must demonstrate that (1) he was engaged in activity protected by Title VII; (2) his actions were known to the defendant; (3) subsequently, the employer took action adverse to the plaintiff or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the plaintiff's activity and the actions of the defendant. Morris, 201 F.3d at 792. Upon the showing of a prima facie case by the plaintiff, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If such a reason is provided, the plaintiff must "show that [the employer's] stated reason [] was in fact pretext." Id. Despite the shifting of the burden of production of evidence, Campbell "bears the burden of persuasion throughout the entire process." Virts v. Consol. Freightways Corp., 285 F.3d 508, 521 (6th Cir. 2002).

Plaintiff filed a grievance with CCL, and later filed a charge with the THRC, regarding what he perceived to be discriminatory application of the company's drug testing policy. Accordingly, Campbell has established his engagement in activity both protected by Title VII and known to the Defendant. See Sawicki v. American Plastic Toys, Inc., 180 F.Supp.2d 910, 915 (E.D.Mich. 2001) (noting that Section 704(a) includes protection for an employee from employer retaliation for making a charge or complaint). Because the Court has concluded that Campbell was not subject to severe or pervasive retaliatory harassment, in order to establish a prima facie case of retaliation, he must demonstrate adverse actions taken against him by CCL that are causally connected to his discrimination charge. Morris, 201 F.3d at 792. In an effort to meet

this burden, Plaintiff incorporates by reference the incidents described in support of his claim of a racially hostile work environment.  (Pl.'s Resp. at 18-19.)  Campbell does not allege, and the Court cannot conclude, that the increased scrutiny by CCL management, rumors regarding his involvement in criminal activities, or the incidence of racial graffiti resulted in "a materially adverse change in the terms of [his] employment."  White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789, 797 (6th Cir. 2004).  Thus, only the reduction in overtime and Campbell's alleged constructive discharge[17] will be considered as potential adverse employment actions.

However, the Court finds that neither of these events can support Plaintiff's claim of retaliation.  Regarding the overtime reduction, even assuming Plaintiff can establish a prima facie case of retaliation on this basis, CCL has offered a legitimate non-discriminatory reason for its action.  Specifically, CCL maintains that Unilever withdrew its business from the Memphis plant in the fall of 2002, resulting in an overall decrease in work volume.  (Taylor Dep. at 121-23.) Consequently, according to CCL, overtime for all employees was reduced.  (Id.) Campbell has not set forth any facts creating a material dispute regarding Defendant's justification.  Further, Plaintiff has offered no specific evidence showing that his overtime was diminished disproportionately or in a manner otherwise inconsistent with the terms of the CBA controlling distribution of overtime.  The Court notes Plaintiff's generalized complaint that overtime was offered to the senior qualified employees in his department rather than to those within his job

---

[17] It is unclear whether Plaintiff intended to assert his alleged constructive discharge as an adverse employment action in the context of his retaliation claim, or whether he intended solely to allege a hostile-work environment constructive discharge claim.  The hostile work environment constructive discharge claim has already been addressed.  See infra p.21-22.  In the interest of thoroughness, the Court will also address the matter in the context of his retaliation claim.

classification as required by the CBA.  (Pl.'s Resp. at 12.)  However, Plaintiff provides no facts demonstrating that, even if true, this practice actually resulted in an unfair reduction in Campbell's overtime in retaliation for his complaint or, most importantly to this analysis, demonstrates that Defendant's proffered reason was pretext for retaliation. See Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 623 (6th Cir.2003) (finding that unsupported speculation cannot form the basis for demonstrating pretext); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("A reason cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.")  Because Campbell has failed to show that CCL's stated reasons for the overtime reduction was false and that it was a pretext for retaliation, he cannot prevail on such a claim pursuant to Title VII on this basis.

Finally, the Court finds that Plaintiff's alleged constructive discharge fails to establish an adverse employment action necessary to maintain a Title VII retaliation claim.  Although a plaintiff may establish an adverse employment action by demonstrating that he was constructively discharged, the Court finds that Campbell has not made such a showing.  Logan v. Denny's, Inc., 259 F.3d 558, 568 (6th Cir.2001).  Constructive discharge occurs when an employer "deliberately create[s] intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit."  Moore, 171 F.3d at 1080.  The Sixth Circuit has identified the following factors as relevant to evaluating whether such conditions exist: (1) a demotion; (2) reduced salary; (3) reduced job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering,

23

harassment or humiliation by the employer designed to encourage the employee's resignation; and (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  Logan, 259 F.3d at 569.  Notably, none of the actions alleged by Campbell contain the factors identified by the Sixth Circuit.  While Campbell does allege harassment, he offers no argument or support for the conclusion that the harassment was designed to encourage his resignation and thus, has not demonstrated that his resignation constituted an adverse employment action.  Accordingly, to the extent Campbell's retaliation claim is predicated on his alleged constructive discharge, the claim fails as a matter of law.

### II. Claims against Shutler, Mellinger, Boss, & Regenwether

#### A. Title VII Claims

Plaintiff also brings claims against individual Defendants Shutler, Mellinger, Boss & Regenwether, for discrimination and retaliation in violation of Title VII.  However, based on the Plaintiff's allegations, they cannot be held liable under Title VII.  As Campbell concedes, a claim against a supervisor/employee in his individual capacity in not actionable under Title VII. Wathen v. Gen. Elec. Co., 115 F.3d 400, 406 (6th Cir. 1997) ("we find that the statute as a whole, the legislative history and the case law support the conclusion that Congress did not intend individual[ employees/supervisors] to face liability under the definition of 'employer' it selected for Title VII"); see also (Pl.'s Resp. at 24.).  Accordingly, Plaintiff's claims against the individually named Defendants pursuant to Title VII are DISMISSED.

#### B. 42 U.S.C. § 1981 Claims

Campbell also alleges claims against the individually named defendants for discrimination

on the basis of hostile work environment and retaliation in violation of 42 U.S.C. 1981.  Section

1981"affords a federal remedy against discrimination in private employment on the basis of

race." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459-460, 95 S.Ct. 1716, 44

L.Ed.2d 295 (1975).  Specifically, the statute provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981.  "The law is clear that individuals may be held liable for violations of §1981."

Jones v. Continental Corp., 789 F.2d 1225, 1231 (6th Cir. 1986).  "Section 1981 claims are

analyzed under the Title VII McDonnell Douglas/Burdine framework."  Newman v. Federal

Express Corp., 266 F.3d 401 (6th Cir. 2001); see also infra at 22.  In addition, to establish

individual liability under Section 1981, Campbell must prove that the Defendants' discrimination

was intentional and that they were personally involved in the discriminating conduct.  General

Bldg. Contractors Assoc., Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d

835 (1982)("[Section] 1981 can be violated only by intentional discrimination");  Allen v. Ohio

Dep't of Rehabilitation & Correction, 128 F. Supp. 2d 483, 495 (S.D. Ohio 2001) ("To establish

individual liability, the individual defendant must have been personally involved in the

discriminatory action.").  Plaintiffs bear the burden of proof of these additional elements

throughout the prima facie case as well as in any subsequent pretextual analysis.  Noble, 175

F.Supp.2d at 1042.

As mentioned above, a prima facie case of hostile work environment requires a showing

25

that the plaintiff (1) is a member of a protected group; (2) was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant  knew or should have known about the harassment and failed to take action.  Moore, 171 F.3d at 1078 -1079. "Where the harassment is allegedly committed by a supervisor with immediate authority over the victim, the plaintiff employee need only satisfy the first four elements." Clay v. United Parcel Service, Inc., No. 5:04-CV-1262, 2005 WL 1540224, *25 (N.D. Ohio June 30, 2005) (citing Faragher, 524 U.S. at , 118 S.Ct. at 807). In considering the Plaintiff's claims, the Court notes that Plaintiff must demonstrate the prima facie case on both an objective and a subjective level.  That is, in addition to showing that he subjectively regarded the conditions as abusive, Campbell must also demonstrate that from an objective standard, the conduct complained of was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." Galey v. May Dept. Stores Co., 9 Fed.Appx. 295, 298 (6th Cir. 2001) (citing Harris, 510 U.S. at 21-22).

"To establish a claim for retaliation under Section 1981, Plaintiff must establish the same elements as required under Title VII: (1) he engaged in protected conduct, (2) the exercise of his civil rights was known to Defendant, (3) Defendant thereafter took an employment action adverse to Plaintiff or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment."  Lewis v. Clark of Clarksville, No. 3:04-0532, 2005 WL 2416385, *3 (M.D. Tenn. Sept. 20, 2005) (citing Morris, 201 F.3d 784, 792 (6th Cir.2000)).

The Defendants argue that Plaintiff's claims pursuant to Section 1981 must be dismissed

because Campbell has not alleged any intentional discrimination nor any employment decisions made by these individuals.  (Def.'s Mot. at 20.)  In support of his contentions against the individual Defendants, Campbell maintains generally that they were "involved in a plan to racially harass or retaliate against [him] for his participation in protected activity."  (Pl.'s Resp. at 24.)  The Court will address each Defendant individually.

### *1. Steve Shutler*

Campbell makes two allegations against Shutler.  First, Campbell claims that Shutler discriminated against him by failing to refer his son for a drug test following an accident at the plant.  (Compl. ¶ 19; Campbell Dep. at 55, 58.)  However, because failing to test Dustin Shutler for drug use did not result in an adverse change in employment for Campbell, the conduct cannot form the basis of an actionable discrimination claim pursuant to Section 1981.  See Carter v. University of Toledo, 349 F.3d 269, 275 (6th Cir. 2003) (noting that satisfaction of the four-part test for a prima facie case of discrimination requires a showing that the plaintiff suffered an adverse employment action); see also Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886-87 (6th Cir.1996) (defining an adverse employment action as a "materially adverse change in the conditions of employment" such as termination of employment, a decrease in salary, or a material loss in benefits) .  Second, Campbell asserts that Shutler subjected him to increased scrutiny in retaliation for his discrimination charge, citing the disparate treatment of Shutler's son.  (Campbell Dep. at 58.)  It is undisputed that Shutler had no supervisory authority over Campbell and, consistent with this fact, never took any disciplinary or other adverse action against him.  (Campbell Dep. at 58.)  Rather, Campbell complains generally that Shutler "was

always asking me what I [was] doing and following me around the plant." (Campbell Dep. at 57.)

Considering these facts in the light most favorable to Campbell, the Court is not able to conclude that the severity, offensive or threatening nature, or impact of the alleged conduct was so extreme as to amount to a change in the terms and conditions of his employment. Faragher, 524 U.S. at 788, 118 S.Ct. at 2284; see also Harris, 510 U.S. at 21, 114 S.Ct. at 370 (noting that the fourth prong of the prima facie case of hostile work environment is satisfied when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."). Further, the Court finds that because the conduct was not severe and did not result in any adverse employment action, it cannot support a claim of retaliation. Accordingly, because Campbell has failed to demonstrate a prima facie case of hostile work environment or retaliation, his claims against Defendant Shutler pursuant to Section 1981 are DISMISSED.

### 2. Ted Mellinger

Plaintiff has not clearly articulated specific claims against Ted Mellinger. In fact, Plaintiff's complaint makes no reference to any actions by Mellinger. (Compl. ¶¶ 8-31.) From a review of the record, the Court notes two allegations concerning Mellinger. First, Campbell alleges that Peterson repeatedly warned Campbell that Mellinger was scrutinizing him. (Pl.'s Resp. at 25.) However, because Campbell has not alleged any personal conduct by Mellinger to support this contention, it is not actionable under Section 1981. See Allen, 128 F. Supp. 2d at 495. Second, Plaintiff maintains that Mellinger was responsible for distributing overtime in a

28

manner inconsistent with the CBA.  (Pl.'s Resp. Def.'s Facts ¶ 17.)   Campbell insists that Mellinger, either on the basis of racial animosity or in retaliation for his discrimination charge, unfairly reduced the amount of overtime he received.  (Campbell Dep. at 152.)  Aside from these general and conclusory statements, Plaintiff has not provided any evidence demonstrating that his overtime was in fact reduced as compared to any other employees.   Accordingly, based on the facts presented, there is no indication that Campbell suffered an adverse employment action sufficient to establish a prima facie case of retaliation.  As such, all claims against Defendant Mellinger pursuant to Section 1981 are DISMISSED.

### 3. Roger Boss

Plaintiff's complaint alleges that Roger Boss, along with Cathy Regenwether, discriminated against him by insisting that he submit to a drug test following the September 2002 accident in the alcohol room with which Campbell was undisputedly not involved.  (Compl. ¶ 14.)   A claim of retaliation cannot be maintained against Boss on the basis of this conduct because it occurred prior to his filing a charge of discrimination.  Campbell also fails to establish a prima facie case of hostile work environment as to Defendant Boss.  Specifically, Plaintiff has not established that this isolated incident in which Boss was involved, and from which Plaintiff experienced no adverse employment action, was sufficiently severe or pervasive enough to meet the high threshold set forth by the prima facie case. As such, Plaintiff's claims against Defendant Boss in his individual capacity are DISMISSED.

### B. THRA Claims

While THRA does not generally permit individual liability for employees or supervisors,

the statute specifically provides for individual liability in instances where defendants aided, abetted, incited, compelled, or commanded an employer to engage in discriminatory acts or practices.[18]  TENN. CODE ANN. § 4-21-301(2); see also Carr v. United Parcel Serv., 955 S.W.2d 832, 836-37 (Tenn.1997), *overruled on other grounds*, Parker v. Warren County Util. Dist., 2 S.W.3d 170 (Tenn.1999).  However, the Court finds that Plaintiff has not offered facts to support such a finding.  Further, because Plaintiff has not established a prima facie case of hostile work environment or retaliation, there is no underlying violation of THRA for these individually named Defendants to have aided or abetted.  Guster v. Hamilton County Dept. of Educ., No. 1:02-CV-145, 2004 WL 1854181, *30 (E.D.Tenn. March 2, 2004).  Accordingly, Campbell's claims of discrimination and retaliation against the individually named Defendants pursuant to THRA are DISMISSED.

<u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS the Defendants' motion for summary judgment and DISMISSES Plaintiff's claims pursuant to Title VII, 42 U.S.C. § 1981, and the THRA.

**IT IS SO ORDERED** this 30th day of January, 2006.

s/ J. Daniel Breen
UNITED STATES DISTRICT JUDGE

---

[18] Specifically, the Act provides that "[i]t is a discriminatory practice for a person or for two (2) or more persons to ··· (2) Aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter."  TENN. CODE ANN. § 4-21-301(2).